UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GREG GRIFFITH, ET AL.                    CIVIL ACTION

VERSUS                                   NO: 07-9738

D. HUGHES, ET AL.                        SECTION: "A" (2)

**ORDER AND REASONS**

Before the Court is a **Motion to Dismiss Pursuant to FRCP 12(c), or Alternatively, for Summary Judgment (Rec. Doc. 71)** filed by defendants Officers D'Meecko Hughes, John Helou, Brian Harrison, and Simone Quintero (collectively "the Defendant-Officers"), and a **Motion to Dismiss Pursuant to Rule 12(c), or Alternatively, for Summary Judgment (Rec. Doc. 57)** filed by defendant Warren J. Riley, Superintendent of New Orleans Police Department. Plaintiffs, Greg Griffith and Noah Learned, oppose the motions. The motions, which were set for hearing without oral argument on October 14, 2009, are before the Court on the briefs without oral argument. For the reasons that follow, the motion for summary judgment filed by the Defendant-Officers is GRANTED IN PART AND DENIED IN PART. The motion for summary judgment filed by Riley is GRANTED IN PART AND DENIED IN PART.

**I. BACKGROUND**

This lawsuit arises out of an encounter between the plaintiffs, Greg Griffith and Noah Learned, and the Defendant-

1

Officers of the New Orleans Police Department ("NOPD") on February 18, 2007, at the Bacchus parade.  Plaintiffs contend that Griffith, who had a video recorder, began filming the Defendant-Officers interacting with a group of youths nearby. One officer then approached Griffith without speaking and proceeded to tackle and restrain him.  Griffith's camera fell to the ground and Learned attempted to retrieve it.  An officer then tackled Learned.  Griffith's face hit the sidewalk during the altercation and his eyeglasses were broken.  Plaintiffs were then placed under arrest for crossing a police cordon.  They were released on bond at 4:00 a.m. the next morning.  The charges were later dropped.

Griffith and Learned have sued the Defendant-Officers as well as Superintendent Riley.  Plaintiffs have sued Riley in his individual and official capacities.  Plaintiffs are asserting violations of the Fourth Amendment for excessive force and unlawful arrest.  Plaintiffs also contend that Defendants violated their First Amendment right to film police activity in a public area.  Plaintiffs allege that Riley is responsible for implementing a policy of arresting citizens who attempt to film police activities in a public setting and using excessive force in doing so.  Plaintiffs also allege that Riley failed to properly train the NOPD officers involved in the altercation.

2

The Defendant-Officers now move for summary judgment[1] arguing that Plaintiffs do not assert a claim for excessive force or false arrest, and that alternatively the officers are entitled to qualified immunity on those claims. Defendants also move for summary judgment on Plaintiffs' First Amendment claims and on their state law claims.

Superintendent Riley now moves for summary judgment[2] arguing that Plaintiffs have failed to allege facts sufficient to support a claim against him in his official capacity. Riley asserts that he is entitled to qualified immunity for the claims asserted against him in his individual capacity.

This matter is scheduled to be tried to a jury on March 15, 2010.

## II.  **DISCUSSION**

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light

---

[1] Defendants styled this motion as one to dismiss pursuant to Rule 12(c) or alternatively for summary judgment. A significant amount of discovery has been conducted in this case and Defendants have attached a deposition to their motion for the Court's consideration. The Court therefore treats their motion as one for summary judgment.

[2] Riley styled this motion as one to dismiss pursuant to Rule 12(c) or alternatively for summary judgment. For the same reasons given above with respect to the Defendant-Officers' motion, the Court treats Riley's motion as one for summary judgment.

most favorable to the non-movant, "show that there is no genuine issue as to any material fact." TIG Ins. Co. v. Sedgwick James, 276 F.3d 754, 759 (5th Cir. 2002) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. (citing Anderson, 477 U.S. at 248).  The court must draw all justifiable inferences in favor of the non-moving party. Id. (citing Anderson, 477 U.S. at 255).  Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial.  Id. (citing Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986)).  Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. Id. (citing SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1993)).

## 1)    Defendant-Officers' Motion for Summary Judgment

Both excessive force and unlawful arrest claims implicate the Fourth Amendment's proscription against unreasonable seizures.  Peterson v. City of Fort Worth, -- F.3d --, No. 08-10258, 2009 WL 3818826, at *3 (5th Cir. Nov. 17, 2009) (citing

Terry v. Ohio, 392 U.S. 1, 16 n.16 (1968)).  To bring a § 1983 excessive force claim a plaintiff must show 1) an injury, 2) that resulted directly and only from the use of force that was excessive to the need, and 3) that the force used was objectively unreasonable.  Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004) (citing Goodson v. City of Corpus Christi, 202 F.3d 730, 740 (5th Cir. 2000)).  The plaintiff's injury need not be "significant" but the plaintiff must show that he has suffered "at least some injury."  Id. at 397 (quoting Jackson v. R.E. Culbertson, 984 F.2d 699, 700 (5th Cir. 1993)).  Psychological injury alone may sustain a Fourth Amendment claim, id. at 398 (citing Dunn v. Denk, 79 F.3d 401, 402 (5th Cir. 1996) (en banc)), but certain injuries are so slight that they will never satisfy the injury element, id. (citing Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001) (handcuffing too tightly)).

An arrest is unlawful unless it is supported by probable cause.  Flores, 381 F.3d at 402 (citing Hinshaw v. Doffer, 785 F.2d 1260, 1266 (5th Cir. 1986)).  "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense."  Id. (quoting U.S. v. Levine, 80 F.3d 129, 132 (5th Cir. 1996)).

In considering a motion for summary judgment grounded on

qualified immunity, the court undertakes a two-step analysis. First, the court assesses whether a statutory or constitutional right would have been violated on the facts alleged.  Flores, 381 F.3d at 395 (citing Saucier v. Katz, 533 U.S. 194, 200 (2001)). If a violation is properly alleged, the court proceeds to the second step and determines whether the defendant's actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Flores, 381 F.3d at 395 (quoting Hope v. Pelzer, 536 U.S. 730, 739 (U.S. 2002)).

Plaintiff Greg Griffith testified that on the evening of February 18, 2007, he was observing the Bacchus parade with friends on Canal Street near the McDonald's when he noticed a fight among several youths.  Rec. Doc. 104, Exh. B, at 33.  Just after the fight resolved on its own, an NOPD officer "barreled through the crowd" waving a baton "at folks." Id.  At the time, Griffith was standing several feet back in the crowd with about three layers of people in front of him.  Id.  The officer with the baton was then joined by a female officer and then several other officers also arrived on the scene.  Id.  One officer was extremely agitated, yelling, and was being a "public nuisance." Id.  Next, one of the officers approached a female who had been involved in the fight and grabbed her by the hair, at which point

6

she was tackled by two other officers.[3]  Id. at 34.

Griffith began filming the scene when he saw the officer grab the girl's hair, and he questioned the officer "out loud" as to why he was doing that.  Id.  According to Griffith, it was about 60 seconds later, while he was still filming, that one of the officers turned to him, saw him in the crowd with the camera, and told him to stop filming.[4]  Id.  Griffith countered that he had a right to film and he says that at this point the officer walked away.  Id.

Griffith contends that when the officer walked away he began conferring with several other officers near the barricade and that they were pointing toward him.  Id.  At this point, one of the officers pushed his way through the crowd to Griffith, grabbed and tackled him, and either knocked the camera from his hand or attempted to take it.[5]  Id. at 35.  Learned, who attempted to pickup the camera, was then also tackled by another officer.  Griffith contends that he was slammed to the ground hard enough to break his glasses and that he sustained a gash on

---

[3] Griffith identifies the "public nuisance" officer who grabbed the girl's hair as Defendant Hughes.  (Id. at 37).

[4] Griffith identifies this officer as Defendant Hughes.  Id. at 38.

[5] Griffith identifies this officer as the short, white one, and confirms that he is the same one who pushed his way through the crowd.  Id. at 40.  Griffith now clarifies that this was Defendant Harrison.  Rec. Doc. 104, Exh. C, ¶¶ 11-12.

the side of his face from the broken arm of his glasses.  Id.
Griffith was arrested and brought to jail for crossing or
traversing a police cordon, a violation of the Municipal Code.
Rec. Doc. 104, Exh. L.  Griffith's camera was returned to him
when he was released from jail but all of the images were erased.
Griffith brought the camera to a technician who recovered the
film, which has been made a part of the record as Plaintiffs'
Exhibit A, Rec. Doc.104.

    Griffith denies that any of the officers ever told him to
step back at any time and he contends that he was always well
back from where the officers were located.  Id. at 39.  Griffith
contends that at all times he was always at least three persons
back in the crowd.  Id.

    Plaintiff Noah Learned testified that he was at the parade
when a friend came to him and explained that Griffith was doing
some "cop watching" and that the police nearby were acting up so
she wanted Learned to head over there to help.  Rec. Doc. 104,
Exh. D at 17.  Learned walked up and saw Griffith filming and saw
a white police officer in the crowd staring at him.  Id.  Learned
saw the officer approach Griffith and grab him, and at some point
thereafter the camera hit the ground.  Id. at 18.  Griffith then
told Learned to grab the camera and when he attempted to do so he
was either tackled or pushed forcibly to the ground.  Id. at 18,
20.  Learned then went into the "compliance position" and he

could see a number of officers around Griffith.  <u>Id.</u>  Learned
cannot describe the officer who tackled or pushed him because he
came from behind.  <u>Id.</u> at 20, 26.  Learned was arrested and
brought to jail for crossing or traversing a police cordon, a
violation of the Municipal Code.  Learned was not injured in the
incident.  <u>Id.</u> at 30.

Defendant Harrison testified that he recalled arriving on
the scene because of the fight between the youths.  Rec. Doc.
104, Exh. H at 18.  Harrison testified that he told Griffith and
Learned to back away from the scene but that they became
argumentative and refused.  <u>Id.</u> at 19.  According to Harrison the
Plaintiffs were right in the middle of where the fight was taking
place, and they were told to stand back at least three times.
<u>Id.</u> at 22, 23.  Harrison contends that the officers were involved
in trying to separate the youths who were fighting and that the
Plaintiffs were close enough to bump his shoulder yet refused to
move back, asserting that they had a right to be there.  <u>Id.</u> at
26.  Harrison defined a police cordon as the area designated by
officers when dealing with a scene as the space needed to move
the crowd back for safety purposes, depending on the situation.
<u>Id.</u> at 28.  Harrison testified that an individual is subject to
arrest when ordered to stand back from a scene but refuses.  <u>Id.</u>
at 40.

Harrison is the officer who actually arrested Griffith and

Hughes assisted him.  Id. at 30.  Harrison stated that he decided
that the Plaintiffs would be arrested when they repeatedly
refused to stand back but first the ensuing fight had to be
contained.  Id. at 28, 34.  Harrison testified that it was only
moments after the fight and Plaintiffs' refusal to stand back
that they were arrested.  Id. at 48.  According to Harrison, the
filming came after the Plaintiffs had refused to move from the
scene and that the filming had nothing to do with their arrest.
Id. at 44.  Harrison denied that the filming bothered him at all.
Id. at 45.

Defendant Hughes also testified that he told Griffith to
step back from the fight scene several times but he refused, and
that he even "had an exchange of words with him."  Rec. Doc. 104,
Exh. I at 12.  Hughes contends that Griffith asserted that he had
a right to film and that Hughes told him that he could film but
that he had to move back.  Id. at 14.  According to Hughes, he
knew that Griffith had the right to film, but the Plaintiffs were
arrested for refusing to move back during the fight.  Id. at 17,
42.  Hughes confirmed that *both* Plaintiffs had refused to move
back.  Id. at 44.  Hughes explained that the decision to arrest
Plaintiffs was made immediately upon their refusal to move away
from the fight scene but that Griffith had disappeared back into
the crowd so he was not arrested immediately.  Id. at 32, 35.

Hughes testified that by crossing a police cordon in this

10

case the charge referred to Plaintiffs' refusal to move from the area that the officers deemed necessary to safely break up the fight.  Id. at 26.  Hughes testified that this is a common infraction during Mardi Gras.  Id. at 27.

Hughes stated that after the fight broke up he was attempting to return to the street but he noticed that Harrison was involved in an altercation with Griffith so Hughes went back to assist.  Id. at 15.  Hughes did not know what the altercation was about but Griffith was definitely struggling with Harrison. Id. at 16.  Hughes then assisted Harrison, who was his partner for that evening, in taking Griffith to the ground and then he broke way to also take Learned down because he was interfering. Id. at 16.  Hughes testified that he saw Griffith filming prior to the altercation with Harrison but that Griffith was never told to stop filming.  Id. at 18.

Hughes testified that Officer Helou and the female officer (Quintero) assisted to escort Plaintiffs to the paddy wagon.  Id. at 18.  Hughes prepared the arrest paperwork that evening and signed the affidavits in support of Plaintiffs' arrest.  Id. at 29; Rec. Doc. 104, Exh. L.

Defendant Helou testified that he and Officer Quintero were at the street barricade when they noticed that Harrison and Hughes had taken two males into custody--who he now believes to be the Plaintiffs.  Rec. Doc. 104, Exh. J, at 26.  When Helou

11

approached the scene Plaintiffs were already under arrest and he
assumed that they had been involved in the prior fight.  Id. at
27, 28.  Helou never saw a camera.  Id. at 31.  Helou has no
firsthand knowledge about what took place prior to the arrest.
Id. at 37.  Helou's sole role was to assist Quintero in escorting
one of the Plaintiffs to the paddy wagon.  Id. at 32.

Defendant Quintero testified that she helped escort
Plaintiffs to the paddy wagon after they had already been
arrested.  Rec. Doc. 104, Exh. K at 20.  Like Helou, she has no
firsthand knowledge about the events leading up to the arrest.
Id. at 27, 29.  Quintero did not recall a camera being involved
during the incident.  Id. at 34.

The foregoing recitation of the parties' testimony regarding
what took place leading up to arrest compels the conclusion that
Harrison and Hughes are not entitled to summary judgment on
Griffith and Learned's claims for false arrest.  Harrison and
Hughes effected the arrests of both Plaintiffs for crossing a
police cordon, i.e., repeatedly refusing to step away from the
fight scene when instructed to do so.  Harrison's and Hughes'
testimony regarding the facts that predicated the arrest is
completely contradicted by the Plaintiffs' version of the facts,
and it will be up to the jury to decide which version is
truthful.  If the jury credits the officers' version of the
events, then no constitutional violation for false arrest will

12

have occurred and the officers will be entitled to qualified immunity on that claim.[6]  If the jury credits Plaintiffs' version of the events, however, then there will have been no probable cause to arrest them on the charges asserted, and Defendants do not question that Plaintiffs' right to be free from false arrest was clearly established at the time of the incident.  Thus, if Plaintiffs are believed then Harrison and Hughes will have violated the Plaintiffs' clearly established right to be free from false arrest and qualified immunity will not apply.  The motion for summary judgment is DENIED as to defendants Harrison and Hughes on the false arrest claim in light of the disputed and material facts that precipitated the arrest.

     For the same reasons, the motion for summary judgment is DENIED as to defendants Harrison and Hughes on Griffith's First Amendment claim because if the jury credits Plaintiffs' version of events then the jury could conclude that Griffith was arrested for simply filming the officers.  At no time have Defendants questioned that the right to film the police on a public street is clearly established.  In fact, every Defendant-Officer and NOPD representative to testify thus far in the case has confirmed that citizens have the right to film the police so long as they

_____

     [6] Plaintiffs should note that if they were validly arrested for crossing a police cordon then Defendants' subjective intent or "real" motivation for arresting will not be pertinent. <u>Mendenhall v. Riser</u>, 213 F.3d 226, 231 (5th Cir. 2000) (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987)).

do not interfere with a police investigation.  Thus, if the jury concludes that Griffith was arrested for filming the police, then qualified immunity will not apply.

The motion for summary judgment is GRANTED as to all Defendants on Learned's First Amendment claim because the facts do not support a claim on his behalf for a violation of this right.  Learned never attempted to film the police and according to his own testimony his sole involvement in the encounter began when he approached the scene and attempted to retrieve Griffith's camera.  Learned claims that he was then immediately tackled. Thus, Learned's own version of events does not support the inference that he attempted to exercise any First Amendment rights when he was arrested either by filming the police or simply observing their activity from a safe distance.

The motion for summary judgment is DENIED as to defendants Harrison and Hughes on Griffith's excessive force claim. Griffith claims that his glasses were broken and that he sustained a gash on his face as a direct result of the force used during the arrest.  This "injury" is sufficient to support a claim for excessive force.  Whether the level of force used was objectively reasonable under the circumstances is a question for the jury to decide.

The motion for summary judgment is GRANTED as to all Defendants on Learned's excessive force claim because he

14

sustained no legally cognizable injury.  It is undisputed that Learned sustained no physical injuries during the encounter.  And while substantial psychological injuries are cognizable in an excessive force claim, the Court is persuaded Learned's testimony precludes a finding that he has sustained a psychological injury as a result of this incident.

Learned's deposition was taken on July 30, 2009, at which time he denied any injuries when questioned by defense counsel. When specifically asked by his own counsel if he had been affected psychologically by the incident he stated that the encounter increased his level of trepidation with respect to engaging in legal observation work.  Rec. Doc. 104, Exh. D at 30-31.  After the motion for summary judgment was filed challenging the injury aspect of the claims, Learned attempted to bolster his earlier statement via an unsworn declaration, in which he states that he now feels "anxiety and trepidation associated with exercising my First Amendment right to observe and document policy activity in public," as a result of the encounter.  Rec. Doc. 101, Exh. E, ¶ 14.  The Court is not persuaded that these vague feelings of trepidation and anxiety rise to the level of "injury" sufficient to support a claim for excessive force.

Finally, the motion for summary judgment is GRANTED as to Defendants Helou and Quintero as to all claims because the evidence does not support a claim against either of these two

officers.  Helou and Quintero testified that they came upon the
scene after Harrison and Hughes already had Plaintiffs in
custody.  Plaintiffs' own version of events does not contradict
Helou's and Quintero's assertion that their sole involvement was
to assist in escorting Plaintiffs to the paddy wagon after
Harrison and Hughes had already arrested them.  Plaintiffs are
attempting to impose personal, civil liability against these
officers, and each one is entitled to have his or her own conduct
evaluated on an individual, not collective basis.  Meadours v.
Ermel, 483 F.3d 417, 421-422 (5th Cir. 2007).  Helou and Quintero
are not personally liable for the alleged transgressions of the
other officers.  Helou and Quintero were not required to
independently ascertain whether Harrison and Hughes had probable
cause to arrest Plaintiffs in order to avoid civil liability for
assisting with getting Plaintiffs to the paddy wagon.  Having
established no violation of their federal rights at the hands of
Helou and Quintero, these Defendants are entitled to qualified
immunity.  Furthermore, the Court sees no basis to impose
liability against these Defendants under state law.

    For the foregoing reasons, the motion for summary judgment
filed by the Defendant-Officers is GRANTED IN PART AND DENIED IN
PART.  The motion is GRANTED as to Defendants John Helou and
Simone Quintero as to all claims.  The motion is GRANTED as to
all Defendants on Learned's claims for excessive force and First

Amendment violations.  The motion is DENIED as to Defendants Harrison and Hughes on all of Griffith's claims and on Learned's claim for false arrest.

**2)  *Riley's Motion for Summary Judgment***

Plaintiffs contend that Superintendent Riley is liable in both his individual/personal and official capacities.  Riley now moves for summary judgment arguing that Plaintiffs have failed to allege facts sufficient to support a claim against him in his official capacity.  Riley asserts that he is entitled to qualified immunity for the claims asserted against him in his individual capacity.

**A.  *Individual/Personal Capacity Claims***

Plaintiffs concede that Riley is not vicariously liable under federal law for the Defendant-Officers' alleged misconduct in either capacity.  Plaintiffs contend that Riley is personally liable because there is a sufficient causal connection between his wrongful conduct and the alleged violations of their First Amendment rights.  Plaintiffs identify Riley's wrongful conduct as his failure to train or properly supervise NOPD officers regarding citizens' First Amendment rights notwithstanding a litany of publicity about this issue.

To state a § 1983 claim, the plaintiff must allege the violation of a constitutional right that was committed by a person acting under color of state law.  <u>James v. Tex. Collin</u>

17

County, 535 F.3d 365, 373 (5th Cir. 2008) (quoting <u>Moore v.</u>
<u>Willis Indep. Sch. Dist.</u>, 233 F.3d 871, 874 (5th Cir. 2000)). A
plaintiff must establish that the defendant was either personally
involved in the deprivation or that his wrongful actions were
causally connected to the deprivation. <u>Id.</u> (citing <u>Anderson v.</u>
<u>Pasadena Indep. Sch. Dist.</u>, 184 F.3d 439, 443 (5th Cir. 1999)).
A supervisor is not personally liable for his subordinates'
actions in which he had no involvement. <u>Id.</u> A supervisory
official is only liable when his own conduct denies the
claimant's constitutional rights. <u>Estate of Davis v. City of N.</u>
<u>Richland Hills</u>, 406 F.3d 375, 380-71 (5th cir. 2005).

In order to establish a claim against Riley in his personal
capacity, the Plaintiffs must show that 1) he failed to supervise
or train the officers, 2) a causal connection existed between the
failure to supervise or train and the violation of Plaintiffs'
rights, and 3) such a failure to train or supervise amounted to
gross negligence or deliberate indifference. <u>Doe v. Taylor</u>
<u>Indep. Sch. Dist.</u>, 15 F.3d 443, 452-53 (5th Cir. 1994) (quoting
<u>Hinshaw v. Doffer</u>, 785 F.2d 1260, 1263 (5th Cir. 1986)).

In this circuit, the test for deliberate indifference is a
significantly high burden for the plaintiff to overcome.
<u>Hernandez v. Tex. Dep't of Prot. & Reg. Servs.</u>, 380 F.3d 872, 882
(5th Cir. 2004) (citing <u>Doe v. Dallas Indep. Sch. Dist.</u>, 153 F.3d
211, 218 (5th Cir. 1998)). To establish deliberate indifference,

the plaintiff must demonstrate culpability beyond mere negligence or even gross negligence. Id. (citing Conner v. Travis County, 209 F.3d 794, 796 (5th Cir. 2000)). The cornerstone of § 1983 liability is intentional choice and not merely unintentional negligent oversight. See id. (quoting Rhyne v. Henderson County, 973 F.3d 386, 392 (5th Cir. 1992)).

It is undisputed that Riley was not personally involved in the alleged deprivation of Griffith's First Amendment rights. It is also undisputed that NOPD officers are not specifically trained in the contours of citizens' First Amendment rights to observe police activity. Thus, the record supports the first element of a § 1983 claim in that a failure to train is present. But giving full credit to Plaintiffs' version of the events, and construing all factual inferences in their favor, it does not follow that the absence of specific training caused the First Amendment violations alleged here. In fact, nothing in the record supports a causation inference. All of the Officer-Defendants, as well as the non-defendant NOPD 30(b)(6) deponents, testified that they were fully aware that citizens generally have the right to observe and photograph police activity in public areas. Defendants' defense is not one of ignorance of the law but rather that probable cause existed to arrest Plaintiffs for an infraction wholly unrelated to any First Amendment

activities.[7]  And even if Harrison and Hughes are lying about the events leading up to the arrest, the inference to be drawn from the record is not that Harrison and Hughes violated Griffith's rights because their training was deficient, but rather because they intentionally chose to act unlawfully by arresting Plaintiffs without probable cause for an actual crime and then lying about it.

In addition to a lack of evidence to support a causation inference, the record does not support a finding of deliberate indifference on the part of Riley so as to hold him personally liable for what might have occurred.  Plaintiffs have argued that Riley had constructive knowledge about repeated NOPD abuses for First Amendment rights but the Court is persuaded that constructive knowledge under these facts is insufficient as a matter of law to meet the high burden necessary to demonstrate deliberate indifference.[8]

For the foregoing reason, Riley's motion for summary judgment is GRANTED as to all claims asserted against him in his individual/personal capacity.

---

[7] Plaintiffs are reminded that if the jury finds that they were validly arrested for the crime with which they were charged then it does not matter that they believe that the real reason was to punish them for observing the police.  See note 6 supra.

[8] A claim against Riley personally for failure to supervise would also be subject to the deliberate indifference standard, which again is not met in this case.

20

**B.    Official Capacity Claims**

Plaintiffs contend that Riley is liable in his official capacity because the evidence shows that the NOPD has a customary policy of inhibiting individuals' rights to observe, document, or film police activity in public.  The claims against Riley in his official capacity are actually municipality claims against the City of New Orleans pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  See James, 535 F.3d at 375 n.6.

To maintain a § 1983 claim against a municipality, a plaintiff must show 1) an official policy, 2) promulgated by the municipal policymaker, 3) that was the moving force behind the violation of a constitutional right.  Peterson, -- F.3d --, No. 08-10258, 2009 WL 3818826, at *6.  An official policy can be written or it can arise in the form of widespread practice that is "so common and well-established as to constitute a custom that fairly represents municipal policy."  Peterson, -- F.3d --, No. 08-10258, 2009 WL 3818826, at *6 (quoting Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

A policy or custom is official only when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.  Id. (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989)).  The plaintiff must establish that the policy was the moving force behind the violation or direct

causation. Id. "[T]here must be a direct causal link between
the policy and the violation." Id. (quoting Piotrowski v. City
of Houston, 237 F.3d 567, 580 (5th Cir. 2001)).[9]

A pattern of violations is tantamount to official policy
when it is so common and well-settled as to constitute a custom
that fairly represents municipal policy. Peterson, -- F.3d --,
No. 08-10258, 2009 WL 3818826, at *9 (quoting Piotrowski, 237
F.3d at 579). Where prior incidents are used to prove a pattern,
they must have occurred so long or so frequently that the course
of conduct warrants the attribution to the governing body of
knowledge that the objectionable conduct is the expected,
accepted practice of city employees. Id. (quoting Webster, 735
F.2d at 842). The pattern of abuses must transcend error made in
any single case and a pattern requires similarity and
specificity. Id. A pattern also requires "sufficiently numerous
prior incidents" as opposed to "isolated incidents." Id.
(quoting McConney v. City of Houston, 863 F.2d 1180, 1184 (5th
Cir. 1989)).

Plaintiffs have offered evidence regarding seven to nine

---

[9] Municipal liability can also arise if the failure to train
or supervise officers amounts to a policy. Peterson, -- F.3d --,
No. 08-10258, 2009 WL 3818826, at *7-8. The same standards
applicable to Riley in his personal capacity for failure to train
or supervise would apply against the municipality. See Snyder v.
Trepagnier, 142 F.3d 791, 795 (5th Cir. 1998). For the reasons
given above with respect to the claims against Riley personally,
the facts do not support a Monell claim against the City for
failure to train or supervise.

other incidents of NOPD officers confronting citizens for observing or filming police activity, and Plaintiffs contend that this evidence establishes a pattern sufficient to constitute an official policy.  In order to establish an official policy via a custom or pattern of activity, the prior incidents must be sufficiently numerous as well as sufficient similar to the alleged violations in this case.  In this circuit, this standard is a very stringent one to meet.  See Peterson, 2009 WL 3818826, at *10 (holding that 27 prior complaints were insufficient in light of the department's size); Pineda v. City of Houston, 291 F.3d 325, 329 (5th Cir. 2002(holding that eleven prior incidents were insufficient to create an official policy).

The City's motion was directed solely at the sufficiency of Plaintiffs' allegations and did not address this evidence.  The City not only failed to challenge the numerosity and specificity of the prior incidents but it is also clear that some of the evidence offered will be excluded from trial as hearsay.  Having left Plaintiffs' evidence unchallenged, the Court finds that Plaintiffs have presented sufficient evidence to create a dispute of material fact about the existence of a widespread pattern of First Amendment violations condoned by the City.

For the foregoing reasons, Riley's motion for summary judgment is DENIED as to the claims asserted against him in his official capacity.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Dismiss Pursuant to FRCP 12(c), or Alternatively, for Summary Judgment (Rec. Doc. 71)** filed by defendants Officers D'Meecko Hughes, John Helou, Brian Harrison, and Simone Quintero is **GRANTED IN PART AND DENIED IN PART** as explained above.  All claims asserted against defendants Helou and Quintero are **DISMISSED**;

**IT IS FURTHER ORDERED** that the **Motion to Dismiss Pursuant to Rule 12(c), or Alternatively, for Summary Judgment (Rec. Doc. 57)** filed by defendant Warren J. Riley, Superintendent of New Orleans Police Department is **GRANTED IN PART AND DENIED IN PART** as explained above.

December 16, 2009

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE